UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TRACY LELIAERT,

        Plaintiff,

v.

CITY OF SOUTH BEND *et al.*,

        Defendants.

CAUSE NO. 3:22-CV-359 DRL

OPINION AND ORDER

In May 2020, law enforcement officers arrested Tracy Leliaert for trespassing on city property after she refused to leave a homeless encampment. She alleges a violation of her constitutional rights. She claims that Officers Joshua Morgan and Ryan Williams violated her First and Fourth Amendment rights when they removed her, and when Chief Scott Ruszkowski failed to intervene. She names the City of South Bend for the actions of its officers. The defendants seek summary judgment. The court grants the request, except to leave for a jury the excessive force claim against Officer Morgan.

BACKGROUND

Early in the COVID-19 pandemic, the City of South Bend, concerned about criminal activity and COVID-19 liability, decided to clear a homeless encampment occupying city property [32-3 ¶¶ 5, 8]. The City gave the encampment's inhabitants three days advance notice and told them to pack up and move by 10:00 a.m. on May 26, 2020 [*id.* ¶ 6]. Signs posted at the site communicated this order [32-14 Tr. 71].

When notice alone didn't work, Chief Ruszkowski dispatched officers to the site with orders to clear the property [32-3 ¶ 8]. Chief Ruszkowski explained to the crowds who had set up the encampment that they needed to leave, and he told them that if they stayed, they risked being arrested [*id.* ¶¶ 11-12]. One gentleman volunteered to allow those with nowhere else to go to shelter temporarily in his church

[32-4 ¶ 22]. Some people began to protest, including Ms. Leliaert, despite knowing that she was supposed to be off the property [32-14 Tr. 72, 79].

Ms. Leliaert isn't unhoused, but she wanted to remain at the encampment in solidarity with William Binion, a person who wouldn't leave [43-3 Tr. 60]. She later acknowledged the "health crisis" on the property and understood the City's need to disperse the people camped there [43-3 Tr. 121]. At the time, she repeatedly screamed at officers that they had been exposed to COVID-19, including immediately after the incident, and voiced her concerns about forcing the residents to leave the encampment site [*see, e.g.* 33 (Ex. G 1:27:15, Ex. I 1:26:39)].

Officers Morgan and Williams were both on the scene that day helping to clear the lot. When the lot was almost cleared, Mr. Binion still refused to leave [32-14 Tr. 70]. Over four hours after the announced deadline to vacate, officers approached Ms. Leliaert, who was sitting by Mr. Binion [*id.* Tr. 72]. Ms. Leliaert remained seated by him, even when officers communicated their intent to arrest her. She wrapped her arm around Mr. Binion's leg [43-3 Tr. 106].

Officer Morgan proceeded to arrest Ms. Leliaert. He instructed her to put her hands behind her back [33 (Ex. G 1:27:07-08)]. Officer Morgan took her left arm and began to attach zip cuffs [*id.* (Ex. G 1:27:09)]. Officer Williams took her right arm [*id.* (Ex. G 1:27:12-14, Ex. H 1:19:52)]. Ms. Leliaert initially complied with instructions, providing her hands to be zip-cuffed [*id.* (Ex. G 1:27:09-21)], but then she began to pull her right hand away [*id.* (Ex. G 1:27:26-27, Ex. H 1:19:53)]. Next to her, officers struggled to arrest Mr. Binion, who squirmed and yelled [*id.* (Ex. G 1:27:42)].

Officers warned Ms. Leliaert not to resist and then forced her to the ground facedown to secure her arrest when she continued to pull her hand away [*id.* (Ex. G 1:27:31-32, Ex. H 1:20:00)]. It took both Officers Morgan and Williams to subdue Ms. Leliaert, who immediately began to scream that she couldn't breathe as Officer Williams finished securing her hands [*id.* (Ex. G 1:27:32-43, Ex. H 1:28:00-11)]. As she yelled, Officer Morgan repeatedly instructed her to "stop resisting" [*id.* (Ex. G 1:27:52)]. Ms. Leliaert

responded that she wasn't resisting [*id.* (Ex. G 1:27:56)] and yelled for officers to stop hurting her wrist [*id.* (Ex. G 1:27:57-58)]. After Ms. Leliaert continued yelling, "I am not resisting" [*id.* (Ex. G 1:28:05-06, 1:28:24)], Officer Morgan responded, "Well, you were." [*id.* (Ex. G 1:28:06-07)].

Officer Morgan noticed the other officers struggling to secure Mr. Binion, and he asked them if they needed help [*id.* (Ex. G 1:28:09-10)]. He leaned over Ms. Leliaert, still on her stomach on the ground, to assist as officers secured Mr. Binion's hands [*id.* (Ex. G 1:28:10-22, Ex. H 1:20:40-21:03)]. Officer Williams kept Ms. Leliaert's hands secure during this brief period. Ms. Leliaert told officers to get off her back shortly after this [*id.* (Ex. G 1:28:26)].

Officers Morgan and Williams then sat Ms. Leliaert up and tried to get her to stand [*id.* (Ex. G 1:28:48, Ex. H 1:21:17)]. Ms. Leliaert said she couldn't stand because they hurt her [*id.* (Ex. G 1:28:53-54)]. Eventually, Ms. Leliaert, still insisting that she wasn't resisting, stood up, and officers escorted her to the police van without needing to assist her walking [*id.* (Ex. G 1:29:10-35)]. Throughout the encounter, Chief Ruszkowski was in an alley near the lot, and he didn't see the arrest happen [32-3 ¶¶ 14-15]. This suit ensued.

## STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could find in its favor to prevent summary judgment. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must deny the motion when there is admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

The court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any

material dispute of fact that requires a trial." *Id.* The court must construe all facts in a light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

"Although on summary judgment [the court] generally view[s] the facts in the light most favorable to the nonmovant, in rare circumstances when video footage clearly contradicts the nonmovant's claims, [the court] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)). "Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations," but "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [the court] will not indulge stories clearly contradicted by the footage." *Id.*; *see also Dockery v. Blackburn*, 911 F.3d 458, 466-468 (7th Cir. 2018) (plaintiff's claim that he didn't resist was "utterly discredited" by the video that clearly depicted resistance); *Gasser v. Vill. of Pleasant Prairie*, 2022 U.S. App. LEXIS 8015, 4-5 (7th Cir. Mar. 28, 2022) ("In cases where video evidence is available, as here, there are additional contours to the summary judgment methodology. '[T]o the extent [plaintiff's] story is 'blatantly contradicted' by the video such that no reasonable jury could believe it, we do not credit h[er] version of events.'") (citation omitted).

## DISCUSSION

Ms. Leliaert alleges violations of her constitutional rights under 42 U.S.C. § 1983. Section 1983 serves as a procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a § 1983 claim, Ms. Leliaert must show that she was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006).

4

A. *Count I—Excessive Force under the Fourth Amendment.*

Ms. Leliaert advances Fourth Amendment excessive force claims against Officers Morgan and Williams. Use of force against a suspect is a seizure subject to the Fourth Amendment's reasonableness requirement. *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021). When determining the force's reasonableness, the court considers the circumstances, including the crime's severity, the immediate threat the suspect posed to the safety of officers and others, and if the suspect actively resisted or attempted to evade arrest by flight, or the danger posed if the suspect were left unattended. *Graham*, 490 U.S. at 396; *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). In addition, the court considers "whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties." *Id.*

The analysis requires an inquiry into "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (quotations omitted). Courts must examine the reasonableness of the actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. An officer acts reasonably when deploying force if he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "Authorities must be allowed to graduate their response to the demands of any particular situation." *United States v. Montoya De Hernandez*, 473 U.S. 531, 542 (1985); *accord Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (citation and quotations omitted).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397. Ultimately, the fundamental question is "whether the totality of the circumstances justified a particular sort of . . . seizure." *Garner*, 471 U.S. at 8-9.

5

Officers Morgan and Williams mention qualified immunity. The defense of qualified immunity "shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993) (quotations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If no constitutional right was violated, there is no need for further inquiry. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

If a violation can be established, the next step is to ask whether the right was clearly established. *Id.* This inquiry must be undertaken considering the case's particular circumstances. *Id.* "A constitutional right is clearly established for qualified-immunity purposes where [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 725 (7th Cir. 2013) (quotations omitted). "[A] case holding that the exact action in question is unlawful is not necessary." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). The plaintiff bears the burden of proving that the right is clearly established by either pointing to a similar case or "showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (internal quotations omitted).

Officers are permitted to use some force when making a valid arrest. *Catlin v. City of Wheaton*, 574 F.3d 361, 366 (7th Cir. 2009). Excessive force cases often present factual issues for the jury, when parties "tell different stories about what happened." *Id.* at 367. Force is "only reasonable when it is proportional to the threat posed." *Alicea*, 815 F.3d at 288. It is reasonable to put someone in a prone position to prevent injury to the individual and the officers. *Padula v. Leimbach*, 656 F.3d 595, 604 (7th Cir. 2011). "Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Est. of Phillips*, 123 F.3d at 593.

6

The "reasonableness of kneeling on a prone individual's back during the arrest turns, at least in part, on how much force is applied. Kneeling with just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable." *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005); *see also Catlin*, 574 F.3d at 367-68. Noncompliance with orders or other passive resistance requires only minimal use of force, but struggling with officers may warrant escalation. *See Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 524-25 (7th Cir. 2012).

    1. *Officer Morgan.*

Ms. Leliaert was aware that she (and others) were supposed to have left the property hours before Officer Morgan arrested her [43-3 Tr. 72]. Officer Morgan was entitled to use some force when arresting Ms. Leliaert for willingly trespassing on city property and refusing to leave. *See Catlin*, 574 F.3d at 366. The central question is not whether he was entitled to use force but whether that force became excessive. Officer Morgan warned Ms. Leliaert that she would be arrested [32-4 ¶¶ 30-31]. He then ordered her to put her hands behind her back, which she initially did [33 (Ex. G 1:27:13)].

Things escalated when Ms. Leliaert pulled her hand forward, appearing to try and grab the leg of Mr. Binion next to her [*id.* 1:27:27]. She twisted away and resisted being zip-tied [32-4 ¶ 37]. From there, Officer Morgan pushed Ms. Leliaert forward to the ground to get her hands behind her back [*id.* ¶ 39]. He warned her that it wouldn't be wise to resist [*id.* ¶ 38]. No reasonable jury could find this initial move of Ms. Leliaert to the ground unreasonable; officers have a right to subdue resisting arrestees in volatile situations, even for a misdemeanor. *See Abbott*, 705 F.3d at 727; *Est. of Phillips*, 123 F.3d at 593.

Officer Morgan claims that he then placed Ms. Leliaert on the ground and placed his right knee on the ground and his left knee "at a 45-degree angle positioned over Ms. Leliaert's shoulder blades" [32-4 ¶ 40]. Although he admits reaching over to assist officers who were trying to secure Mr. Binion, Officer Morgan denies that his knee was ever on Ms. Leliaert's neck [*id.* ¶¶ 41, 44]. Officer Williams denies seeing any officer use a neck restraint on Ms. Leliaert [43-9 Tr. 47]. Officer Crittendon, also on scene, denies

7

seeing anyone put any pressure on Ms. Leliaert's neck, although he acknowledges that it could harm a person if too much force was used [43-10 Tr. 37].

Ms. Leliaert claims that Officer Morgan didn't identify himself as a police officer, and she testified that once she realized he was a police officer, she complied with his orders [43-3 Tr. 106-07]. She denies resisting arrest [*id.* Tr. 107], but the video clearly shows her pull her hand away from officers, resist, and continue to do so at various moments [33 (Ex. G 1:27: 27, Ex. H 1:19:53)]. *See Horton*, 883 F.3d at 944.

Ms. Leliaert testified that she was flipped to the ground and then "there was a cop that had his knee on [her] neck" [43-3 Tr. 119]. She said that the knee was across her neck and that she couldn't breathe, although she did admit that she could (and did) yell at officers while this was happening, indicating that her breathing wasn't altogether impaired [*id.* Tr. 134-35]. Ms. Leliaert testified that it felt like someone's whole body weight was on her [*id.* Tr. 135]. She also testified that she later experienced stiffness, pain, and lock of mobility in her neck, which a jury could reasonably attribute to neck restraint [*id.* Tr. 146].

The bodycam footage remains inconclusive and thereby leaves these differing accounts a question for the jury. *See Catlin*, 574 F.3d at 367. At one point, Officer Morgan has his knee near Ms. Leliaert's upper back area, but whether he contacts the neck then cannot be ascertained as a matter of law [43-7]. Nor can the level of pressure or force be determined as a matter of law. At another point, Officer Morgan assists the officers arresting Mr. Binion while his knee remains, at least a jury could say, across Ms. Leliaert's neck. Given the number of officers present at the scene and the level of resistance displayed by Ms. Leliaert and Mr. Binion, a jury could question whether it was reasonable for Officer Morgan to assist in this manner, even if he intended to be helpful to the other officers.

An arguably telltale moment occurs as Officer Morgan seems to realize where his knee is placed, and he lifts it and shifts further down the back momentarily [33 (Ex. H 1:20:51)]. A jury could reasonably use this moment, and the video that precedes this moment, to situate Officer Morgan's knee on Ms.

8

Leliaert in a way that would permit it to find for her. And a jury could reasonably conclude that placing a knee on Ms. Leliaert's neck was excessive. There were several officers. The officers had gotten her onto the ground with her hands behind her back [*id.* (Ex. H 1:20:15)]. Officer Morgan testified that he didn't feel threatened at any time by the protestors [43-6 Tr. 49], and Officer Williams also noted that Ms. Leliaert wasn't presenting a danger [43-9 Tr. 47]. *See Phillips*, 678 F.3d at 525 (desire to resolve a potentially dangerous situation doesn't justify the use of force that could cause serious injury). She was unarmed. The overall time was short to be sure—about a minute and a half to effectuate the arrest, with just short of a minute when Officer Morgan's left knee angled over her upper body—but a jury could find this force still to be reasonably excessive, particularly once Ms. Leliaert ceased resisting and she was subdued.[1]

Officer Morgan also mentions qualified immunity as a defense, but only insofar as a constitutional violation has not been supported by the record today. For instance, in one sentence he argues that qualified immunity applies because there is no constitutional violation; and later underscores that, to the extent a triable issue remains after review of the video, the sole issue for the jury would be whether he used excessive force by placement of his left knee. This is enough to preserve the defense for purpose of deciding whether a constitutional violation occurred, but it does not invite the court to consider whether the right was clearly established. *See Lovelace v. Gibson*, 21 F.4th 481, 487-88 (7th Cir. 2021). A jury thus must decide the excessive force claim against Officer Morgan limited to his use of his left knee.

    2. *Officer Williams.*

The only force Ms. Leliaert accuses Officer Williams of using is pushing her forward onto the ground and yanking her arms behind her back. She spends most of her response brief focused on Officer Morgan. Officer Williams assisted in the arrest [32-5 ¶ 21]. He detailed how Ms. Leliaert tried to rip her

---

[1] Outside of the constitutional standard for excessive force that applies today, Chief Ruszkowski reported that a neck restraint isn't permitted by the South Bend Police Department [32-3 ¶¶ 17-18], and Officer Williams testified that placing a knee on a suspect or arrestee's neck was only appropriate in life or death situations [43-9 Tr. 46-47]. No one claims this was that kind of threatening situation.

9

arm away as he tried to zip-tie her hands even after being told to stop resisting [*id.* ¶¶ 23-26] and says she was directed to the ground because she was resisting [*id.* ¶ 28]. Despite Ms. Leliaert's claims, the video confirms that Ms. Leliaert pulled her arm away from Officer Williams [33 (Ex. G 1:27:27, Ex. H 1:19:53)]. *See Horton*, 883 F.3d at 944. Officers may use some force if a suspect squirms. *Abdullahi*, 423 F.3d at 771. Officer Williams did just that. No reasonable jury could find his use of force unreasonable. The court grants summary judgment for Officer Williams on this excessive force claim.

      B. *Count II—Failure to Intervene under the Fourth Amendment.*

Ms. Leliaert argues that Officer Williams and Chief Ruszkowski failed to intervene when Officer Morgan used excessive force against her. "Though legally distinct, the fate of [a] failure to intervene claim is closely linked to that of [an] excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene." *Id.* at 767-68. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know [] that excessive force was being used . . . [] or that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *see Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). A realistic opportunity to intervene may exist whenever an officer could have "called for a backup, called for help, or least cautioned [the officer] to stop." *Yang*, 37 F.3d at 285.

      1. *Officer Williams.*

The defendants correctly point out that Ms. Leliaert never brought a failure to intervene claim against Officer Williams. Ms. Leliaert's amended complaint lists four counts: excessive force against Officers Morgan and Williams, a claim of supervisory liability against Chief Ruszkowski, a First Amendment right-to-assembly claim, and a *Monell* claim against the City. Ms. Leliaert's deadline for amending her pleadings was September 9, 2022, and she filed the amended complaint that controls this

10

case [15, 16]. She didn't attempt to add a failure to intervene claim against Officer Williams until her response to the summary judgment motion.

Generally, a "plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *accord Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). This is not a situation in which the pleading articulated facts from which Ms. Leliaert is now advancing a new legal theory; indeed, the amended complaint specifically charged Officer Williams with using excessive force [16 ¶¶ 13, 15, 25]. Instead, Ms. Leliaert wants to raise a distinct new claim, and that isn't permissible on this record. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023); *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017).

When considering whether to allow a plaintiff constructive leave to amend, which is rarely appropriate, the court considers the potential prejudice to parties. *See Schmees*, 77 F.4th at 490. Allowing a new claim against a defendant months after discovery has concluded would prejudice Officer Williams. New discovery would be sought to elucidate what Officer Williams specifically knew and did vis-à-vis Officer Morgan's use of force. Ms. Leliaert had over a year to amend her complaint; justice does not require allowing her to do so now. *Id.* The court denies Ms. Leliaert's attempt to introduce a new claim at this late stage and grants summary judgment for Officer Williams on the failure to intervene claim.

    2. *Chief Ruszkowski.*

Chief Ruszkowski says he wasn't near Ms. Leliaert when Officers Morgan and Williams arrested her. He admits to being near the property, but he argues that he did not make the decision to arrest Ms. Leliaert, nor was he involved in the arrest. Ms. Leliaert says Chief Ruszkowski spoke to her before her arrest and came near the encampment threating to use force [32-14 Tr. 72]. Even taking this as true, being on the property alone isn't enough to establish liability—Ms. Leliaert must point to some fact that could show "a realistic opportunity to intervene to prevent the harm." *Yang*, 37 F.3d at 285. Liability may attach

if an officer "is present and fails to intervene." *Id.* The first requirement is that the officer must be present. Plaintiffs need to produce "sufficient evidence that [the] officer had reason to know…excessive force was being used…*and*… had a realistic opportunity to intervene." *Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008) (quotations omitted).

Ms. Leliaert hasn't adduced any evidence that Chief Ruszkowski was aware of the arrest at the time or in the vicinity to know of the alleged excessive force or to stop it. This record shows Chief Ruszkowski didn't witness the arrest and didn't hear anything said; at the time, he was in an alley to the west of the property where the arrest occurred [32-3 ¶¶ 13-15]. Ms. Leliaert doesn't dispute these facts [43 ¶¶ 90-91]. Ms. Leliaert hasn't offered evidence that he saw the arrest or was even within earshot when she was arrested. In fact, she doesn't dispute that he wasn't involved [43 ¶ 89]. On this record, no reasonable jury could conclude that he was present at the arrest and was aware of what was happening—namely that he had an opportunity to intervene. The court grants summary judgment for Chief Ruszkowski on the failure to intervene claim.

C. *Count III—Right to Assemble under the First Amendment.*

Ms. Leliaert alleges a violation of her First Amendment rights. The First Amendment protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 837 (7th Cir. 2011). "Any regulation of speech or assembly on government property must be able to withstand some degree of constitutional scrutiny," but the level of scrutiny "depends in part on the nature of the public property at issue." *Lavite v. Dunstan*, 932 F.3d 1020, 1028 (7th Cir. 2019).

This turns on the kind of forum. Governments have the least amount of regulatory power in traditional public fora and more in the case of a designated public forum, with the most power in a nonpublic forum. *Id.* However, "reasonable time, place and manner regulations are permissible" in any fora, so long as they don't turn on content. *Id.* The government may restrict access to a nonpublic forum

"as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quotations omitted). If public property hasn't been designated as a public forum, "the government may control access… if the two criteria of reasonableness and viewpoint neutrality are met." *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 63 F.3d 581, 587 (7th Cir. 1995). Government restrictions on a nonpublic forum "need only be *reasonable*;" they don't need to be "the most reasonable or the only reasonable limitation." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 808 (1985).

Ms. Leliaert claims that South Bend and its officers violated her First Amendment right by arresting her for trespass, but she somewhat inexplicably then cites the Eighth Amendment to argue that enforcing anti-camping ordinances against those without adequate shelter or a place to go criminalizes homelessness and constitutes cruel and unusual punishment. Ms. Leliaert cites *Martin v. City of Boise*, 920 F.3d 584, 604 (9th Cir. 2019), for the proposition that an ordinance criminalizing sleeping outdoors for the unhoused violates the Eighth Amendment.

The Supreme Court just rejected this argument—holding that the Eighth Amendment does not dictate homelessness policy. *See City of Grants Pass, Oregon v. Johnson*, 144 S. Ct. 2202, 2226 (2024). *Martin* never mentions assembly—the right Ms. Leliaert cites. It also deals with an entirely different statutory scheme—Ms. Leliaert was being arrested for trespass, not camping. *Grants Pass*, which also addresses a camping prohibition, similarly mentions assembly only in passing, as an example of rights the Constitution protects, not as a claim in the case. *Id.* at 2215.

Indeed, because Ms. Leliaert had a home, it seems less than clear that she would have standing to bring an Eighth Amendment challenge. *See Food and Drug Admin. et al. v. All. for Hippocratic Med. et al.,* 602 U.S. 367, 379 (2024) ("plaintiff cannot be a mere bystander, but instead must have a personal stake in the dispute"). The United States Constitution confines the judiciary's power to "Cases" and "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, a plaintiff must have standing—an injury, fairly

13

traceable to the defendant's conduct, that the court's decision will likely redress. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 284-85 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It is not "dispensed in gross," so a plaintiff "must demonstrate standing for each claim [she presses] and for each form of relief [she seeks]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The "standing doctrine serves to protect the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379-80 (quotations omitted). Here those most directly affected by the decision to remove the homeless encampment were those people living on the property, not Ms. Leliaert; and federal courts aren't a "vehicle for the vindication of the value interests of concerned bystanders." *Id.* at 381-82 (standing screens out those who have "only a general legal, moral, ideological, or policy objection to a particular government action").

As her claim stands, the Eighth Amendment doesn't control; the First Amendment does. Rather than attempt to make a free speech argument or even address the type of forum, Ms. Leliaert tells the court that this case is "about the fact that the City of South Bend had no interest in finding an alternative site for the homeless." The fact that there may have been alternatives to arrest doesn't bear on the First Amendment claim.

The defendants argue that while the property in question was public property, it was a nonpublic forum. Outside of the traditional realm of public fora like parks and sidewalks, the government may create a public forum by designation. *Cornelius*, 473 U.S. at 802; *accord Lavite*, 932 F.3d at 1028. Courts focus on the government's intent to classify the forum, not how speakers may use the forum. *United States v. Krahenbuhl*, 88 F.4th 678, 683 (7th Cir. 2023). The government has an interest in ensuring public safety. *Lavite,* 932 F.3d at 1030.

Here, the government took no affirmative steps to open the vacant lot to protests. The individuals knew they were on city property, and they had been given 72 hours to leave the property, emphasized by

14

no trespassing signs [32-13]. Additionally, the officers repeatedly explained that the area was not open to the public [33 (Ex. G 1:24:08)]. Ms. Leliaert provides no evidence or even argument that this was a traditional or designated public forum. And the government didn't target a viewpoint. Ms. Leliaert acknowledged that she knew she wasn't supposed to be on the land [32-14 Tr. 71-72]. The City wanted everyone off the land because of concerns about COVID-19 and public safety [32-3 ¶ 5]. Code enforcement stood by ready to clean the cleared lot [*id.* ¶ 7]. This was a reasonable motivation for the government's action, particularly in May 2020, before COVID-19 vaccines. Ms. Leliaert may disagree with the City's decision, but removing her didn't violate any established First Amendment right.

Additionally, South Bend has a local ordinance entitled "Special Event on Public Property Regulations" [32-12]. South Bend, Ind., Code of Ordinances ch. 14, art. 15.[2] That ordinance provides: "Any person organizing a demonstration where twenty-five (25) or more persons are reasonably expected to participate shall complete and file a Demonstration Form with the Clerk to the Board of Public Works not less than seventy-two (72) hours in advance of the demonstration." § 14-167(a). The ordinance outlines that "[i]f a demonstration is held without a permit, the participating persons shall be required to disperse if the police determine that public safety is being jeopardized because of actual or threatened harm. In such cases, police must communicate the order directing the participating persons to disperse peacefully before taking action to cause such dispersal." § 14-167(c).

Ms. Leliaert conceded that she did not know if there was a permit [32-14 Tr. 78-79]. She didn't file for one. She admitted that there were more than 25 people assembled, estimating around 60 [*id.* Tr. 78]. Police were concerned about safety, especially considering the pandemic (a concern Ms. Leliaert herself repeatedly emphasized), and they ordered the encampment to disperse repeatedly. Ms. Leliaert doesn't dispute being ordered to leave, and she doesn't explain why this wasn't a reasonable governmental

---

[2] The court takes judicial notice of this ordinance. *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

action. She didn't comply with the neutral, reasonable regulations. She hasn't established any First Amendment right. The court grants summary judgment for the defendants on this count.

    D. *Count IV—Monell Claim against the City.*

Fourth, Ms. Leliaert brings a *Monell* claim against the City. Under 42 U.S.C. § 1983, a person may sue anyone who, while acting under color of state law, causes her to be deprived of any of her constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). A municipality can only be held liable under § 1983 if "execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The law recognizes three paths to municipal liability for the deprivation of a person's constitutional rights: (1) an express policy, (2) a widespread custom, or (3) a deliberate act of a decisionmaker with final policymaking authority. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

To succeed on a § 1983 claim in this vein, a plaintiff must establish that (1) she suffered a deprivation of a federal right (2) as a result of an express policy, a widespread custom, or a deliberate act of a decisionmaker with final policymaking authority for the county that (3) was the proximate cause of her injury. *See King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). "The 'official policy' requirement for liability under § 1983 is to 'distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *Est. of Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis omitted). "To prove an official policy, custom, or practice within the meaning of *Monell*, [a plaintiff] must show more than the deficiencies specific to [her] own experience, of course." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016).

Ms. Leliaert brings a *Monell* claim based on the City's failure to train and hire employees and failure to discipline the officers [16 ¶¶ 39-42]. She also alleges that the City engaged in a "code of silence" that allowed misconduct to go unpunished and contributed to a culture that caused officers, including

16

the officers involved in this case, to believe that excessive force would not be properly investigated, motivating their actions here [*id.* ¶¶ 45-48]. The defendants argue that summary judgment is appropriate because each allegation is conclusory, Ms. Leliaert hasn't identified any policies or practices, and the City's conduct wasn't the driving force behind the arrest and alleged excessive use of force here.

In response, Ms. Leliaert claims a broad lack of discipline existed, pointing to the fact that Officer Morgan wasn't arrested for his May 26, 2020 arrest of Ms. Leliaert. This isn't enough to allege an official policy, custom, or practice because it focuses on only her case. *See Daniel*, 833 F.3d at 734-35. She also says she has presented evidence of a department-wide policy and incidents of excessive force without citing to any facts in the record beyond Mr. Epperson's inadmissible opinions.

First, even assuming Officer Morgan did place his knee on Ms. Leliaert's neck for the *Monell* analysis, the record is clear that this act would have violated the South Bend Police Department's explicit policy. Chief Ruszkowski confirmed that "South Bend Police Department officers are not trained to use neck restraints on arrestees, because neck restraints are not allowed" and that South Bend's "use of force policy does not allow for any type of neck restraint" [32-3 ¶¶ 17-18]. The department's policy considers neck restraints to be deadly force and forbids them "except when deadly force is required to preserve the life of the officer or others" [32-11 at CITY 1165]. Officer Williams also confirmed this, testifying that the policy prohibited the use of neck restraints to subdue a subject unless the situation was "life or death" [43-9 Tr. 46-47]. Ms. Leliaert hasn't shown any other examples of neck restraints that would demonstrate a pattern, and the department policy clearly doesn't allow neck restraints unless deadly force is necessary—something she doesn't dispute [43 ¶¶ 92-93]. No reasonable jury could conclude that the department had a policy, practice, or custom of using excessive force through neck restraints.

Second, Ms. Leliaert provides no evidence that the officers were insufficiently trained. A plaintiff may take an "alternative path to *Monell* liability" by alleging that the need for more or different training is "so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference

17

of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380 (7th Cir. 2020) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). This is known as a failure-to-train theory of liability. *Flores v. City of S. Bend*, 997 F.3d 725, 733 (7th Cir. 2021). Though the law does not "absolutely foreclose the possibility that a plaintiff might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations," a plaintiff relying on a failure-to-train theory must still eventually "provide enough evidence of custom and practice to permit an inference that the [municipal entity] has chosen an impermissible way of operating." *Calhoun*, 408 F.3d at 381. Training "from the Indiana Law Enforcement Academy [] is 'evidence that, as a matter of law, it was not the policy'" to train officers inadequately. *Est. of Williams v. Ind. State Police*, 26 F. Supp.3d 824, 860 (S.D. Ind. 2014) (quoting *Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918 (7th Cir. 2003)). Ms. Leliaert hasn't provided any evidence or reason to think that these officers were inadequately trained; no reasonable jury could reach such a conclusion on this record.

That just leaves Ms. Leliaert's claim that a failure to discipline and code of silence led to the alleged constitutional violation. A "defendant's 'code of silence' can give rise to a valid *Monell* claim," but the claim still requires "a widespread practice that permeates a critical mass of an institutional body." *Giese v. City of Kankakee*, 71 F.4th 582, 589 (7th Cir. 2023) (quoting *Rossi v. City of Chi.*, 790 F.3d 729, 737 (7th Cir. 2015)) (emphasis omitted). Anecdotal evidence isn't enough. *Rossi*, 790 F.3d at 738. And Ms. Leliaert's evidence doesn't even provide anecdotes; she doesn't specify what behaviors or incidents she is referencing. *See, e.g., Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (evidence of grand jury investigation and plaintiff's testimony insufficient). Her summary judgment response says she has presented sufficient evidence of a department-wide policy and incidents of excessive force such that it could also be found that there was deliberate indifference to the fact that failure to discipline officers for such conduct did or could result in additional such incidents, but the record does not support this claim. Ms. Leliaert also states that Officer Morgan believed that his jiujitsu training would correlate to his police

18

duties, but that doesn't create a code of silence or support the idea that he believed he wouldn't be disciplined if he used excessive force [42 at 15 (referencing 43-6 Tr. 28)]. *See Brumitt v. Smith*, 102 F.4th 444, 446 (7th Cir. 2024) (officer's martial arts training didn't make force used clearly excessive).

Ms. Leliaert also hasn't shown the "direct causal link" between the alleged violation and the City's actions or that the City's actions were the "moving force" behind the force. *See First Midwest Bank v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021). "[T]his rigorous causation standard guards against backsliding into respondeat superior liability." *Id.* She suggests that a jury *could* find that Officer Morgan would have known that he was unlikely to be punished and that he thus was free to commit unconstitutional excessive force and argues that whether there is a causal link must be left to the jury. But she must point to something the jury could base that finding on, and she provides no evidence for a reasonable jury to find such a causal link. The court grants summary judgment for the defendants accordingly.

## CONCLUSION

Accordingly, the court GRANTS the summary judgment motion on Counts II, III, and IV and for Officer Williams on Count I [30], DENIES the motion on Count I against Officer Morgan [30], and DENIES AS MOOT the motion for an extension [46]. Only Ms. Leliaert's claim of excessive force against Officer Morgan remains for trial.

SO ORDERED.

August 20, 2024                             *s/ Damon R. Leichty*
                                            Judge, United States District Court